UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

ARIEL ECHEVARRIA-PEREZ,

                              Petitioner,          **No. 06-CV-0841(VEB)**
          -vs-                                     **DECISION AND ORDER**

JOHN BURGE, Superintendent,

                              Respondent.
_____

## I.      Introduction

Proceeding *pro se*, Ariel Echevarria-Perez ("Echevarria-Perez" or Petitioner") seeks a

writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the basis that his detention in state

custody is unconstitutional. Petitioner is serving an indeterminate sentence of 25 years to life

pursuant to a judgment of conviction entered against him in New York State Supreme Court

(Monroe County) following a jury trial on charges of second degree (depraved indifference)

murder.

The parties have consented to final disposition of this matter by a magistrate judge

pursuant to 28 U.S.C. § 636(c)(1). For the reasons that follow, the petition is dismissed.

## II.     Factual Background

On the evening of June 7, 2000, Luis Saez ("Saez") was walking south along North

Clinton Avenue in the City of Rochester, with four other people (his adult daughter Evelyn Saez

("Evelyn") and her boyfriend, José Danny Vega ("Vega"); together with Saez's friend, Chino;

and Saez's other daughter, nine-year-old Madeline Saez ("Madeline")). They had just dropped

off some film to be developed and were on the way back to Saez's home at 323 Clifford Avenue,

a few blocks way. All of a sudden, three men jumped out of a brown automobile brandishing machetes. Evelyn recognized them as men who had accosted her the previous summer; she knew them as "Fish," "Miechi" and "Lazaro." Evelyn explained that on that earlier occasion, while they were drunk, they had tried to "feel on" her, but she resisted and the incident ended with Lazaro spitting at her. Evelyn told her father and mother, Myrna Echevarria ("Mrs. Echevarria"), (no relation to the Petitioner), about the matter at the time.

 The driver of the brown vehicle was identified at trial by several witnesses, including Vega and Evelyn, as Petitioner. Petitioner remained inside the car during the incident. T.344-50, 351-59, 404-15, 476-77 (Numbers preceded by "T." refer to pages from the trial transcript.)

Saez and Vega, who were both unarmed, fled while Evelyn watched from a nearby store where she remained with her sister. Two of the men pursued Saez and Vega on foot, swinging their machetes in an effort to slash the older man. The third man chased Chino on foot toward Carl Street. Petitioner, meanwhile, was "circling around" Saez with his car. T.356-62, 365, 415-20.

Michael Cunliffe ("Cunliffe") happened to be driving by and pulled over when he noticed Saez and was concerned about the situation. Cunliffe explained that Saez had once intervened and done him a good turn when Cunliffe was involved in a group of people "fighting and arguing" at Carl Street and North Clinton.

On the night of the murder, Cunliffe recalled seeing two men with machetes jump out of the back seat of the brown sedan and chase Saez's friend down Carl Street. Before any of the men on foot could reach Saez, the vehicle caught up with him. Evelyn saw her father, who was a former boxer, "punch it" and the driver. Cunliffe identified the driver as Petitioner.

Vega and Cunliffe saw Saez throw several punches, and Vega also observed Saez break one of the windows. T.364-65, 420-21, 522-27.

Saez then ran south along Clinton Avenue toward his home on Clifford Avenue, where his wife, Myrna Echevarria, was outside watching. Evelyn had also begun to run home. Meanwhile, Vega was trying to call the police from a nearby store. Cunliffe, who was still inside his car, saw the brown vehicle do a "doughnut" in the middle of Clinton Avenue after which Petitioner "floored it". The car gave "a little screech" as it rounded the comer onto Clifford, and Petitioner drove "right into Luis [Saez]," about 25 to 30 feet from the corner. T.366, 422, 470-72, 527-32, 563-64.

Although they did not hear the screeching sound, Vega, Evelyn, and Mrs. Echavarria each saw that Saez was hit hard enough to send his body "flying" upwards. After bouncing onto and off the car's windshield, in what Cunliffe described as a "cartwheel," Saez landed head first on the pavement while Petitioner sped off. Mrs. Echevarria confirmed that the vehicle had come from the direction of Clinton Avenue when it collided with her husband, who had already turned onto Clifford Avenue and was looking west in her direction. Mrs. Echevarria recalled, "It lifted him up in the air and he fell on top of the glass and landed on the ground." T.366, 428, 470-73, 527-32.

Several other motorists saw the incident as well. Eugene Michael ("Michael"), a battalion chief with the Rochester Fire Department, was stopped on Clifford Avenue, east of Clinton Avenue, behind five or six other cars wailing for a red light to change. He saw a man running south on Clinton Avenue turn west onto Clifford Avenue, while a brown vehicle made the same turn–at a faster than normal speed but not so excessive as to appear "out of control". Michael

observed the brown car striking the running man and catapult his body into the air. T.497-501.

Edwin Ortiz and Lydia Ortiz were heading in the other direction, east on Clifford Avenue, when they saw a man walking rapidly as if he were "agitated" toward them. They watched as he was struck by the brown automobile which "quickly turned right" from Clinton onto Clifford. Mr. Ortiz estimated the car's speed at impact as between 25 and 35 miles per hour, which was slower than Vega thought it was traveling, but consistent with Cunliffe's approximation of the car's speed before the turn. By this point, "Fish" was back in the car. T.427, 476, 522, 563, 608-12, 622-27, 647.

After the collision, Petitioner did not slow down until he passed Mrs. Echevarria as she was running to her husband's side. "Fish" stuck his head out the window and said something to her. Petitioner meanwhile continued driving east, turned onto Lill Street, and then made a U-turn which enabled Cunliffe to catch up with him. Petitioner downplayed the incident, assuring Cunliffe, "Hey, don't worry about it" and continued driving away. Cunliffe took down the vehicle's license number before returning to the stricken Saez. T.476-79, 534-39.

Edwin Ortiz also followed Petitioner and when his vehicle finally came to a stop at Roth Street and Avenue A, he pulled along side and asked him why he had hit the man. Petitioner pointed to his face indicating that something had provoked him. T.613-18.

The autopsy established the cause of Luis Saez death to an "extremely severe" closed head injury, consistent with his being struck by a moving automobile and hitting the pavement on his head, resulting in massive brain damage. T.599-603. Defense counsel did not cross-examine the medical examiner.

Petitioner fled to New Jersey once he found out that Saez had died, but he returned to

-4-

Rochester in January of 2001. He arranged to surrender himself on March 19, 2001, explaining,

"I am getting too old to keep running." T.645-47, 654, 725. After being advised of his

constitutional rights, in both English and Spanish, he waived them and gave Investigator Randall

Benjamin the following account of the killing and what caused it:

> Last summer I had hit a person on Clifford Avenue. What led up to this was that
> my two friends, Miechi and Fish, had a problem with the guy I hit, his name is
> Luis. Luis had robbed Miechi and punched him in the face. We reported it to the
> police. Luis was arrested, but Miechi never followed through with it and Luis got
> out of jail. After that, they had problems with Luis and his friends. I never had
> problems with these guys before, but after they saw me with the police that day, I
> don't think they like me either.
> In June of last year. I am not sure of what day it was. I had picked up Miechi and
> Fish. We went to a store on Clifford Avenue at Mead. I had parked my car right in
> front of the store. Luis and two other guys came down Clinton Avenue from Carl
> Street. When they came down the street. Meichi and Fish got out of the car.
> They started fighting with the guys and I stayed in the car. When I was in the car,
> Luis came up to the car and punched me in the nose and made it bleed. He then
> broke the window of the door right behind me and kept hitting the car. I then took
> off.
> I drove up to Carl Street and turned around. When I turned around, Miechi got in
> the car with me. I then went down Clinton Avenue and turned on Clifford towards
> Conkey Avenue. When I turned the comer. I saw Luis standing in the road. I
> thought he was going to hit me again, so I hit him.

Petitioner continued with a description of his flight from the scene, and confirmed that when "the

guy in the white car" (i.e., Cunliffe) who followed him said something about the man he had hit

and left lying in the street, he responded by pointing to his face and saying. "Look what he did to

me!" T.711-26.

The defense theory was killing of Luis Saez was an accident. *See*, *e.g.*, T.756. The

prosecution presented alternative theories of liability–that Echavarria-Perez's act of striking Saez

with his vehicle was either an intentional act, or was done with depraved indifference to human

life. The jury returned a verdict convicting Petitioner of depraved indifference murder.  Petitioner

was sentenced to 25 years to life.

His direct appeal and collateral motion to vacate the judgment were unsuccessful. This

timely habeas petition followed in which Petitioner raises the following issues:(1) his conviction

was against the weight of the evidence; (2) his identification procedure was unduly suggestive;

(3) his sentence was harsh and excessive; and (4) the trial evidence was sufficient to convict him

of intentional murder but insufficient to convict him of depraved indifference murder.

**III.    Discussion**

    **A.    Ground One: Verdict Against the Weight of the Evidence**

A challenge to a verdict based on the weight of the evidence differs from one based on

the sufficiency of the evidence: A 'weight of the evidence' argument is a pure state law claim

grounded in New York Criminal Procedure Law § 470.15(5), whereas a legal sufficiency claim is

based on federal due process principles. *People v. Bleakley*, 69 N.Y.2d 490, 515 N.Y.S.2d 761,

508 N.E.2d 672 (1987) (explaining that in determining whether verdict is against the weight of

evidence, the appellate court's analysis proceeds beyond asking whether there is any valid line of

reasoning and permissible inferences which could possibly lead rational persons to the

conclusion reached by the jury to weighing the relative probative force of conflicting testimony

and the relative strength of conflicting inferences that may be drawn from the testimony at trial).

Petitioner's appellate counsel argued on direct appeal that, viewed in a neutral light as

required under a weight-of-the-evidence rubric, the evidence showed that Echevarria-Perez

caused the death of Saez by being simply reckless rather than by acting with the significantly

heightened level of recklessness required to prove depraved indifference. Petitioner requested

that the Appellate Division reduce his conviction to manslaughter in the second degree (i.e.,

reckless homicide).

As Respondent argues, Echevarria-Perez's weight-of-the-evidence claim is not

cognizable on federal habeas review.  The "weight of the evidence" claim asserted here derives

from New York Criminal Procedure Law ("C.P.L.") § 470.15(5), which permits an appellate

court in New York to reverse or modify a conviction where it determines "that a verdict of

conviction resulting in a judgment was, in whole or in part, against the weight of the evidence."

N.Y. CRIM. PROC. LAW § 470.15(5). Thus, a "weight of the evidence" argument is a pure state

law claim grounded in the criminal procedure statute, whereas a legal sufficiency claim is based

on federal due process principles. *People v. Bleakley*, 69 N.Y.2d at 495. Since a "weight of the

evidence claim" is purely a matter of state law, it is not cognizable on habeas review. *See* 28

U.S.C. § 2254(a) (permitting federal habeas corpus review only where the petitioner has alleged

that he is in state custody in violation of "the Constitution or a federal law or treaty"); *Estelle v.*

*McGuire*, 502 U.S. at  68 ("In conducting habeas review, a federal court is limited to deciding

whether a conviction violated the Constitution, laws, or treaties of the United States.").

Federal courts routinely dismiss claims attacking a verdict as against the weight of the

evidence on the basis that they are not federal constitutional issues cognizable in a habeas

proceeding. *Ex parte Craig*, 282 F. 138, 148 (2d Cir. 1922) (holding that "a writ of habeas corpus

cannot be used to review the weight of evidence . . ."), *aff'd*, 263 U.S. 255  (1923); *Garrett v.*

*Perlman*, 438 F. Supp.2d 467, 470 (S.D.N.Y. 2006) (same); *Douglas v. Portuondo*, 232 F.

Supp.2d 106, 116 (S.D.N.Y. 2002) (same). In keeping with this well-settled precedent,

Echevarria-Perez's weight-of-the-evidence claim is dismissed as not cognizable in this habeas

proceeding.

**B.      Ground Two: Unduly Suggestive Identification Procedure**

After a *Wade* hearing, the trial court rejected Petitioner's contention that the array of six computer-generated photographs shown to some of the eye-witnesses was unduly suggestive. A. 50-55. It found that the array portrayed adult males "each with a similar appearance and possessing the same general physical characteristics as the defendant, whose photograph is found not to be distinctive." The trial court found that two of the identifications, by Edwin Ortiz and Isabel Rosario, were "confirmatory in nature" because each recognized the killer of Luis Saez as someone he or she already knew.[1]

On direct appeal, the Appellate Division rejected Petitioner's contention regarding the identification procedure, finding that the photographic array was not unduly suggestive because it could not be said that some characteristic of one picture drew the viewer's attention in such a way as to indicate that the police had made a particular selection. The Appellate Division determined that trial court had properly found, in the alternative, that the identification was merely confirmatory, inasmuch as one of the witnesses who identified defendant had a prior acquaintance with him.

Petitioner's claim implicates clearly established federal law. *E.g.*, *Kennaugh v. Miller*, 289 F.3d 36, 42 (2d Cir. 2002) (noting that "Supreme Court precedent has set forth a due process standard . . . prohibiting the admission of unreliable eyewitness testimony."). It was adjudicated on the merits; therefore, AEDPA's deferential standard of review applies. *Id.* In order to obtain

---

[1]      Two of the five eyewitnesses, Vega and Mrs. Echevarria, did view the photographic array or make any pretrial identifications. T.414-15, 476-78. Thus, they were not part of the suppression hearing. However, they did make an in-court identification of Petitioner.

federal habeas relief, Petitioner must demonstrate that the Appellate Division's decision rejecting his claim "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

Although the "reliability of eyewitness identification testimony is usually an issue for jury determination," it may be excluded to preserve a defendant's due process rights when "the degree of unreliability leads to 'a very substantial likelihood of irreparable misidentification.'" *Kennaugh*, 289 F.3d at 43 (quoting *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977)). "Where the pretrial identification procedures used with a given witness have been impermissibly suggestive, a later in-court identification by that witness will violate due process unless the in-court identification is shown to have reliability independent of those procedures." *Jarrett v. Headley*, 802 F.2d 34, 42 (2d Cir.1986) (citation omitted).

The two-part inquiry for determining whether pretrial identification procedures tainted an in-court identification first asks whether the pretrial identification procedures "unduly and unnecessarily suggested that the defendant was the perpetrator." *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir.2001); *see also id.* ("Suggestive identification procedures 'increase the likelihood of misidentification,' and '[i]t is the likelihood of misidentification which violates a defendant's right to due process.") (quoting *Neil v. Biggers*, 409 U.S. 188, 198 (1972)). If the court answers this question affirmatively, it must then "weigh the corrupting effect of the suggestiveness against other factors indicating that the identification may be independently reliable. . . ." *Raheem*, 257 F.3d at 135 (internal quotation marks, brackets and citation omitted); *see also Manson*, 432 U.S. at 114 (holding that "reliability is the linchpin in determining the admissibility of identification testimony."). The question of independent reliability is assessed in light of the

totality of the circumstances. *Biggers*, 490 U.S. at 199-200; *see also Manson*, 432 U.S. at 114.

The state courts' adjudication of this claim was a correct application of Federal law; *a fortiori*, it can be neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent.  As the Appellate Division found, when the composition of the photo arrays or line-ups themselves are challenged as unfair, the appropriate inquiry for the reviewing court to undertake is to determine "whether the picture of the accused, matching descriptions given by the witness, so stood out from all of the other photographs as to 'suggest to an identifying witness that [that person] was more likely to be the culprit.'" *Jarrett v. Headley*, 802 F.2d at 41 (quoting *United States v. Archibald*, 734 F.2d 938, 940 (2d Cir.1984)); *see also United States v. Thai,* 29 F.3d 785, 808 (2d Cir.1993), *cert. denied,* 1994 WL 533290 (1994). Furthermore, as the Appellate Division stated, "[t]he due process clause does not require law enforcement officers to scour about for a selection of photographs so similar in their subject matter and composition as to make subconscious influences on witnesses an objective impossibility." *United States v. Bubar*, 567 F.2d 192, 199 (2d Cir.), *cert. denied*, 434 U.S. 872 (1977). "To defeat a charge of suggestiveness, the government is not required to show that the other pictured individuals or stand-ins have physical features nearly identical to those of the defendant." *United States v. Padilla*, 94-CR-313, 1994 WL 681812, at *6 (S.D.N.Y. Dec. 5, 1994) (citing *Jarrett*, 802 F.2d at 41 (holding that all of the photographs in a photo array are not required to be uniform with respect to a given characteristic); *Tavarez v. Le Fevre*, 649 F. Supp. 526, 530 (S.D.N.Y.1986) ("There is no requirement that a suspect in a lineup be surrounded by people identical in appearance."). Even if there are some physical differences, a photo-array or line-up will not be suggestive so long as the other pictures or stand-ins sufficiently resembled the

defendant "to allay any concern that the witnesses might have been unfairly influenced in their selection of him by any of the noted physical differences between him and the others." *Gossett v. Henderson*, 87 Civ. 5868 (CSH), 1991 WL 135601, at *2 (S.D.N.Y. July 18, 1991), *aff'd mem.,* 978 F.2d 705 (2d Cir.1992), *cert. denied*, 114 S. Ct. 569 (1993).

As the trial court found, all six of the photographs in the array possessed "the same general physical characteristics." Notably, Petitioner does not claim anything was said or done to draw any of the witness' attention to Petitioner's photograph "in such a way as to indicate that the police were urging a particular selection." Petitioner contends that the array was "suggestive" because his face (photograph 4) appeared before a "slightly different background color that [wa]s darker than the others," that the fillers had "darker facial hair and mustaches" than he, and that they were not as "bald." Respondent points out that Petitioner is in front of a lighter background than photograph number 2. Also, although his mustache is less full than those of the individuals in photographs 2, 3, and 5, the difference is marginal. It is inaccurate to characterize the other lineup subjects' facial hair as "darker" than Petitioner's. Respondent further notes that while subjects 5 and 6 have hairlines which have receded somewhat further than Petitioner's, it is inaccurate to describe him as the only "bald" person because the sides of his hair are more closely cropped than those of subject 3 and that subjects 1 and 2 appear to have some "fuzz" in the areas where they have lost most of their hair.

"Because '[t]he fact that a suspect[ ] . . . is distinguishable on the basis of one physical characteristic does not necessarily require suppression of a subsequent identification,' *Heggs v. Harris,* 80 Civ. 2476, 1984 WL 361 at *3 (S.D.N.Y. May 10, 1984), there is no shortage of cases finding lineups and photo arrays acceptable despite differences in hairstyle." *Roberson v.*

*McGinnis,* No. 99 Civ. 9751 DABAJP,  2000 WL 378029, at *8 n.12 (S.D.N.Y. Apr. 11, 2000)

(citing *United States v. Jackson*, 509 F.2d 499, 505 (D.C. Cir.1978) (defendant's "bush hairstyle

was not 'so unnecessarily suggestive and conductive to irreparable mistaken identification' as to

amount to a constitutional violation," even though lineup participants' "haircuts diverged

considerably"); *United States v. Bubar*, 567 F.2d 192, 198-99 (2d Cir.) (photo array not unduly

suggestive where suspect's photograph showed longer, darker hair than other photos), *cert.*

*denied*, 434 U.S. 872 (1977); *Roldan v. Artuz*, No. 97CIV.2562(DAB)(AJP), 2000 WL 19688, at

*13 (S.D.N.Y. Jan. 7, 2000) (lineup not unduly suggestive where suspect had different hairstyle

from two of the four fillers with whom he was placed in lineup; "[d]ifferential in hairstyles does

not create an unduly suggestive lineup"); *Collins v. Scully*, 878 F. Supp. 452, 457 n. 8 (E.D.N.Y.

1995) (lineup not unduly suggestive where suspect was only participant with corn-row hair);

*United States v. Tavares*, No. 94 Cr. 766, 1995 WL 600860, at *6-7 (S.D.N.Y. Oct. 11, 1995)

(photo array not impermissibly suggestive where defendant was only partially bald man in array);

*Dean v. Superintendent, Clinton Correctional Facility*, No. 90-CV-937H, 1995 WL 818660 at *3

(W.D.N.Y. May 18, 1995) (photo array not unduly suggestive where suspect was the only

individual depicted with "gerry curls"), *aff'd*, 93 F.3d 58 (2d Cir. 1996), *cert. denied,* 519 U.S.

1129  (1997); *United States v. Jones*, 652 F. Supp. 1561, 1571 (S.D.N.Y. 1986) ("The fact that

the [defendant's] hair is shorter than that of the others and that he is the only one who is

noticeably balding is not sufficient to render the photospread unduly suggestive."); *United States*

*v. Shakur*, 560 F. Supp. 353, 355 n. 2 (S.D.N.Y. 1983) (lineup not unduly suggestive where

suspect was only participant with noticeably receding hairline; "[t]his singular complaint is

neither weighty nor adequate")).

Even if the photographic array was suggestive, which this Court does not find to be the case, the in-court identifications nevertheless were independently reliable. Edwin Ortiz recognized the driver of the vehicle which struck and killed Saez as someone whom he already knew. Isabel Rosario testified that she had known Petitioner by his first name (Ariel) "for a long time".   As the state courts found, these two witnesses had sufficient familiarity with Petitioner so as to render their identifications independently reliable. This decision was based upon the New York rule that in-court identifications may be admissible despite prior suggestive procedures if the witness knew the defendant. *See People v. Rodriguez*, 79 N.Y.2d 445, 449-50, 583 N.Y.S.2d 814, 593 N.E.2d 268 (1992). The rule stated in *Rodriguez*  "tracks the federal standard that identification procedures violate due process only if they yield 'unreliable' identifications." *Espinal v. Duncan*, No. 00 Civ. 4844(RWS), 2000 WL 1774960, at *3 (S.D.N.Y. Dec.4, 2000) (in-court identification was valid despite use of single photograph where trial court found an independent source of reliability, "namely that [the witness] already knew [petitioner] by first name as well as street name, . . . knew where [petitioner] lived and the car he drove, and had seen him at least 20 times in the prior year.") (internal quotation marks, brackets and citation omitted); *see also Stallings v. Woods*, No. 04 CV 4714(RLM), 2006 WL 842380, at *11 (E.D.N.Y. Mar. 27, 2006) ("In this case, the testimony at the *Wade* hearing established that Rodriguez had seen Stallings 'more than ten' times around the neighborhood prior to the robbery, and had taken out two orders of protection against him. The trial court found that, although Rodriguez was shown a single photograph, his longstanding familiarity with petitioner rendered his identification independently reliable.") (internal citation to record omitted); *United States v. Perez*, No. 01 CR. 848(SWK), 2003 WL 721568, at *4 (S.D.N.Y. Feb.28, 2003) (holding that witness' "level of

contact" with defendant, including numerous meetings and drug transactions over several years, was "sufficient to provide an independently reliable basis for his identification"); *Martinez v. Artuz,* 99 Civ. 5744(WHP)(GWG), 2001 WL 540737, at *9 (S.D.N.Y. May 22, 2001) (finding that where witness knew petitioner for at least three years prior to the crime, saw him once a day and regularly spoke to him, trial court "properly determined that [the witness] was sufficiently familiar with [defendant] to obviate any possibility that the [challenged] lineup could have tainted her identification.").

Finally,  it was harmless because the suppression court's admission of the identifications had no bearing on the outcome of Petitioner's trial. The identification of Petitioner as the perpetrator was not a contested issue. As noted above, Petitioner voluntarily surrendered himself to the police, having decided he was "getting too old for this stuff." T.723-25. Petitioner told the police that he had hit someone with his car a few months previously, specifying  the location of incident and the name of the victim. Moreover, defense counsel repeatedly acknowledged that it was his client who had been driving the vehicle when it struck and killed Luis Saez. T.320-24, 753-57.

### C.    Ground Three: Harsh and Excessive Sentence

As Respondent argues, Petitioner's claim that his sentence was harsh and excessive is not cognizable on habeas review.

Both intentional murder and depraved indifference murder carry the same sentence in New York. Intentional murder is defined in New York State Penal Law ("P.L") § 125.25(1); depraved indifference murder is defined under P.L. § 125.25(2). If a person is convicted under any subsection of P.L. § 125.25, an indeterminate sentence is mandatory. *See* N.Y. PENAL LAW §

60.05(2). The maximum sentence allowed is life, and the minimum sentence cannot be less than fifteen years or greater than twenty-five years. N.Y. Penal law § 70.00. Petitioner received the maximum possible under statute–twenty-five years to life. The Fourth Department declined to exercise its statutory authority to reduce the sentence in the interests of justice, finding it to be neither harsh nor excessive in light of the seriousness of the incident and Petitioner's lengthy criminal history since he emigrated to the United States from Cuba in 1980 (including a conviction for reckless endangerment in 1999, when he "drove his car at a pedestrian with whom he was having a dispute").

A petitioner's assertion that a sentencing judge abused his discretion in sentencing is generally not a federal claim subject to review by a habeas court. *See Fielding v. LeFevre,* 548 F.2d 1102, 1109 (2d Cir. 1977) (petitioner raised no cognizable Federal claim by seeking to prove that State judge abused his sentencing discretion by disregarding psychiatric reports) (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948) ("The [petitioner's] sentence being within the limits set by the statute, its severity would not be grounds for relief here even on direct review of the conviction, much less on review of the state court's denial of habeas corpus.")); *see also White v. Keane*, 969 F.2d 1381, 1383 (2d Cir. 1992) ("No federal constitutional issue is presented where, as here, the sentence is within the range prescribed by state law." ). Although Echevarria-Perez's sentence was the maximum permitted by statute, it did not exceed what was permissible under New York's sentencing scheme. Accordingly, Echevarria-Perez's claim that the trial judge abused his discretion in imposing an allegedly harsh and excessive sentence should be dismissed because it fails to present a federal constitutional issue cognizable on habeas review. *See*, *e.g.*, *White*, 969 F.2d at 1383 (holding that a state habeas petitioner who was

sentenced within the limits of the state law did not present a federal constitutional issue for §
2254 habeas purposes).

Finally, the fact that the sentence imposed after trial and conviction was greater than that
offered to Echevarria-Perez during plea negotiations does not make the sentence illegal; that,
standing alone, does not establish that judge based the length of the sentence on Echevarria's
refusal of the plea offer. *Brown v. Donnelly*, 371 F. Supp.2d 332, 342 (W.D.N.Y. 2005)
(Bianchini, M.J.) ("With respect to his vindictive sentencing claim, I note that the difference
between the offered sentence and the imposed sentence does not make out a claim of actual
vindictiveness.") (citing, *inter alia*, *Chaffin v. Stynchcombe*, 412 U.S. 17, 31 (1973) (noting that
"there is no doubt that those homicide defendants who are willing to plead *non vult* may be
treated more leniently than those who go to trial, but withholding the possibility of leniency from
the latter cannot be equated with impermissible punishment as long as cases sustaining plea
bargaining remain undisturbed") *United States ex rel. Williams v. McMann*, 436 F.2d 103,
106-07 (2d Cir. 1970), *cert. denied*, 402 U.S. 914 (1971)).

### D.   Ground Four: Insufficiency of the Evidence to Support a Conviction for Depraved Indifference Murder

#### 1.   Procedural Default

In support of his C.P.L. § 440.10 motion to vacate the judgment, Petitioner argued that
the evidence established that he acted intentionally and therefore was, as a matter of law, legally
insufficient to prove that he acted with depraved indifference to human life. Petitioner relied on
several then-new cases holding that a depraved indifference murder conviction was
unsupportable as a matter of law where the defendant was guilty of an intentional killing or no

other. *See, e.g.*, *People v. Gonzalez*, 1 N.Y.3d 464, 775 N.Y.S.2d 224, 807 N.E.2d 273 (N.Y. 2004)

The trial court ruled that "review under Section 440.10 [of the New York Criminal Procedure Law ("C.P.L.") is precluded as to those issues which were previously determined on the merits by the Appellate Division, Fourth Department, in its decision in *People v. Perez*, 12 A.D.3d 1028 *denied* 4 N.Y.3d 801, affirming the judgment of conviction (*see* CPL sec. 440.10(2)(a); *see People v. Saunders*, 301 A.D.2d 869)." It apparently included the insufficiency-of-the-evidence argument in that category. Respondent argues that the trial court relied on C.P.L. § 440.10(2)(a) as an adequate and independent state ground for dismissal, thereby precluding habeas review of the claim. *See, e.g.*, *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations omitted).

The Supreme Court has established that the procedural bar doctrine only precludes habeas review when the state procedural ground is firmly established and regularly followed by the state courts. *Walker v. Martin*, 2011 WL 611627 at *7 ("To qualify as an 'adequate' procedural ground, a state rule must be 'firmly established and regularly followed.'"); *Lee v. Kemna*, 534 U.S. 362, 376 (2002) ( "[V]iolation of 'firmly established and regularly followed' state rules . . . [are] adequate to foreclose review of a federal claim."); *James v. Kentucky*, 466 U.S. 341, 348-49 (1984)).

To be "adequate," the state procedural requirement must be "'firmly established and regularly followed by the state in question' in the specific circumstances presented in the instant case." *Murden v. Artuz*, 497 F.3d 178, 192 (2d Cir.2007), *cert. denied*, 552 U.S. 1150, 128 S.Ct. 1083 (2008); *accord, e.g.*, *Cotto v. Herbert*, 331 F.3d 217, 239 (2d Cir. 2003) ("'State courts may

not avoid deciding federal issues by invoking procedural rules that they do not apply

evenhandedly to all similar claims.'").  Here, the trial court relied upon C.P.L. § 440.10(2)(a),

which provides that "the court must deny a motion to vacate a judgment when: . . . [t]he ground

or issue raised upon the motion was previously determined on the merits upon an appeal from the

judgment, unless since the time of such appellate determination there has been a retroactively

effective change in the law controlling such issue . . . ." N.Y. CRIM. PROC. LAW § 440.10(2)(a).

 The cases do hold that C.P.L. § 440.10(2)(a) can constitute an "adequate and

independent" state procedural ground barring federal habeas review. *See*, *e.g.*, *Encarnacion v.*

*Walker*, No. 96CV329FJSGLS, 1998 WL 34002608, at *4 (N.D.N.Y. Aug. 21, 1998) ("The state

trial court's ruling rested on an adequate and independent state procedural rule, N.Y. Crim. Proc.

Law § 440.10(2)(a) & (b), which provides that a court must deny a motion to vacate a judgment

if the issue raised was previously determined on appeal from the judgment, or the judgment is

appealable or pending on appeal and sufficient facts appear on the record to permit adequate

review."); *D'Alessandro v. Fischer*, No. 01 Civ. 2551 LTS/DF, 2005 WL 3159674, at *19

(S.D.N.Y. Nov. 28, 2005) ("[T]he trial court's express reliance on CPL § 440.10(2)(a) indicates

that the court rejected Petitioner's ineffective assistance claim on an independent and adequate

state procedural ground, precluding federal habeas review."). However, under the circumstances

here, I do not believe that the trial court properly applied C.P.L. § 440.10(2)(a) to dismiss a legal-

insufficiency claim on the basis that such a claim had already been decided on direct appeal,

because Petitioner did not raise a legal-insufficiency claim on direct appeal. Rather, he argued

solely that the depraved indifference murder conviction was against the weight of the evidence.

*See* Petitioner's Reply Appellate Brief, 2004 WL 5461989, at *1 ("[T]he argument herein is not

one attacking the legal sufficiency of the evidence."). The claim is not procedurally barred by the

adequate and independent state ground doctrine because the state rule relied upon was not

"adequate" under the circumstances. There being no "adjudication on the merits" to which

AEDPA deference applies, I proceed to consider the insufficiency claim under a pre-AEDPA or

*de novo* standard of review.

        2.      **Merits Analysis**

           a.      **Insufficiency-of-the-Evidence claims—General Principles**

The Due Process Clause of the Fourteenth Amendment prohibits a criminal conviction

"except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime. . .

." *In re Winship*, 397 U.S. 358, 364 (1970). A habeas court reviewing a claim for insufficiency of

the evidence must determine "whether, after viewing the evidence in the light most favorable to

the prosecution, *any* rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in

original); *see also Maldonado v. Scully*, 86 F.3d 32, 35 (2d Cir. 1996) (when reviewing

sufficiency-of-the-evidence claims, "all possible inferences that may be drawn from the evidence

must be construed in the prosecution's favor"). Thus, "a petitioner bears a very heavy burden in

convincing a federal habeas court to grant a petition on the grounds of insufficiency of the

evidence." *Fama v. Commissioner of Corr. Servs.*, 235 F.3d 804, 811 (2d Cir. 2000).

"[A]ssessments of the weight of the evidence or the credibility of witnesses are for the

jury," and thus a habeas court determining whether the evidence is sufficient to satisfy due

process requirements will "defer to the jury's assessments of both of these issues." *Maldonado*,

86 F.3d at 35. When considering whether the evidence was sufficient to support a state

conviction, a habeas court must "look to state law to determine the elements of the crime." *Quartararo v. Hanslmaier*, 186 F.3d 91, 97 (2d Cir. 1999).

As an initial matter, I note the obvious incongruity in Petitioner's allegations regarding his intent or lack thereof. The theory of the defense at trial and on direct appeal was *not* that Echevarria-Perez's conduct was intentional but that it was "garden variety" recklessness rather than the extreme recklessness (i.e., a the conscious disregard of circumstances revealing an exceptional risk of death inherent in defendant's conduct)–required to support a conviction under P.L. § 125.25(2). Indeed, on direct appeal, and in Ground Three of his petition, Echevarria-Perez urged that the court impose a lesser sentence because he did not intend to kill Saez; rather, Saez's death was merely an accident. In Ground Four of his petition, Petitioner has totally reversed course, asserting that he acted intentionally and therefore could not be guilty of depraved indifference murder, a non-intentional homicide. Bearing in mind the principle that complaints of *pro se* petitioners are to be considered liberally in their favor, *Haines v. Kerner*, 404 U.S. 519, 520 (1972), I will proceed to consider Petitioner's insufficiency-of-the-evidence claim.

### b.   Elements of Depraved Indifference Murder Under New York Law

New York's Penal Law provides for two types of second degree murder, intentional murder, which Petitioner now claims should control this Court's decision, and depraved indifference murder, of which petitioner was convicted. A person is guilty of depraved indifference murder when, "[u]nder circumstances evincing a depraved indifference to human life, he recklessly engages in conduct which creates a grave risk of death to another person, and thereby causes the death of another person...." N.Y. Penal Law § 125.25(2). Section 15.05(3) of

the Penal Law defines the term "recklessly" as follows: "A person acts recklessly with respect to

a result or to a circumstance ... when he is aware of and consciously disregards a substantial and

unjustifiable risk that such result will occur or that such circumstance exists. The risk must be of

such nature and degree that disregard thereof constitutes a gross deviation from the standard of

conduct that a reasonable person would observe in the situation." N.Y. PENAL LAW § 15.05(3).

At the time of Echevarria-Perez's conviction, the controlling New York Court of Appeals

case regarding the interpretation of P.L. § 125.25(2), the depraved indifference murder statute,

was *People v. Register*, 60 N.Y.2d 270 (N.Y.1983) (holding that "recklessness is the element of

mental culpability required" in the depraved indifference statute and thus "the focus of the

offense is not upon the subjective intent of the defendant, as it is with intentional murder, but

rather upon an objective assessment of the degree of risk presented by defendant's reckless

conduct"), *cert. denied,* 466 U.S. 953 (1984), *overruled by People v. Feingold*, 7 N.Y.3d 288

(N.Y.2006) ("We say today explicitly . . . depraved indifference to human life is a culpable

mental state."). *Register* distinguished depraved indifference from both intentional murder and

reckless manslaughter. *See* 60 N.Y.2d at 277

 "[T]he law of the State of New York [first] was articulated by *People v. Register,* 60

N.Y.2d 270 [469 N.Y.S.2d 599, 457 N.E.2d 704] (1983) . . . and remained static through [its]

decision in *People v. Sanchez,* 98 N.Y.2d 373 [748 N.Y.S.2d 312, 777 N.E.2d 204] (2002),

which reaffirmed Register." *Policano v. Herbert,* 7 N.Y.3d at 595, 825 N.Y.S.2d 678, 859

N.E.2d 484. Thus, at the time of Echevarria-Perez's conviction on October 31, 2001, *Register*

"state[d] the correct interpretation of the law of New York with respect to the elements of

depraved indifference murder. . . ." *Policano,* 7 N.Y.3d at 602, 825 N.Y.S.2d 678, 859 N.E.2d

484. Recklessness–with an objective assessment of the degree of risk–was the culpable mental state for depraved indifference murder at the time of his conviction. *E.g.*, *Rustici v. Philips,* 497 F. Supp.2d 452, 484 (E.D.N.Y. 2007) (citing, *inter alia, People v. Register,* 60 N.Y.2d at 274), *aff'd*, 308 Fed. Appx. 467 (2d Cir. 2009) (summary order).

*Sanchez* clarified that Register did not stand for the proposition that "ordinary recklessness" was sufficient to establish depraved indifference murder. Rather, what was required under *Register*'s depraved indifference formulation was a showing of "heightened" or "extreme recklessness," that is, "the conscious disregard of circumstances revealing the exceptional risk of death from the defendant's conduct. . . ." 98 N.Y.2d at 380. *Sanchez* explained that the "crux of [depraved indifference] murder . . . [as defined by *Register*] is recklessness exaggerated by indifference to the circumstances objectively demonstrating the enormity of the risk of death from the defendant's conduct." *Id.* Thus, "when the risk of death is manifestly extreme and unjustified . . . a defendant's disregard of the risk elevates and magnifies the degree of recklessness, itself establishing the required circumstances evincing depraved indifference to human life." 98 N.Y.2d at 381.

The New York Court of Appeals, noting that a jury could have found that Sanchez did not intend to kill his victim, found that under *Register*, "based on an objective assessment of the risk defendant recklessly created and disregarded, the likelihood of causing death from defendant's conduct was so obviously severe that it evinced a depraved indifference to human life. Surely, pointing a gun at [the victim], without the slightest justification, discharging it within not more than 18 inches of his body and striking him in the chest, would permit a jury rationally to conclude that defendant demonstrated an indifference to human life so depraved as to be

deserving of the same punishment as intentional murder; that it was virtually a *knowing*, although not intentional, homicide." *Sanchez*, 98 N.Y.2d at 384 (emphasis in original). The *Sanchez* court concluded that "[defendant's] conduct involved such a high risk of death that it could also lead to the conclusion that it was intentional[,]" which "supports rather than detracts from characterizing it as evincing depraved indifference to human life." *Id.* The *Sanchez* court opined that "purposeful homicide itself is the ultimate manifestation of indifference to the value of human life." *Id.* In this Court's opinion, this formulation in *Sanchez* conflated intentional murder with depraved indifference murder.

The *Sanchez* case emphasized that *Register* did not stand for the proposition that "ordinary recklessness" was sufficient to establish depraved indifference murder. Instead, the *Sanchez* court explained, what was required under *Register* was "heightened" or "extreme recklessness–the conscious disregard of circumstances revealing the exceptional risk of death from the defendant's conduct. . . ." *Sanchez*, 98 N.Y.2d at 380. Appellate counsel attempted to contrast Echevarria-Perez's case with *Sanchez*, arguing that although Echevarria-Perez caused the death of Saez, but he did so by being simply reckless rather than by acting with gross carelessness.

"Beginning with [*People v.*] *Hafeez,* 100 N.Y.2d 253 (N.Y. 2003)],the *Register/Sanchez* rationale was progressively weakened so that it would no longer support most depraved indifference murder convictions, particularly one-on-one shootings or stabbings." *People v. Feingold*, 7 N.Y.3d at 294. In *Hafeez*, 100 N.Y.2d 253, after a jury found defendant not guilty of intentional murder but guilty of depraved indifference murder, the Appellate Division held that the evidence was insufficient for depraved indifference murder and the New York Court of

Appeals agreed. The evidence was that months after an unsuccessful confrontation with the deceased, the defendant and his co-defendant lay in wait for the deceased, and the co-defendant stabbed him to death with a knife. Defendant was convicted of depraved indifference murder under an accomplice liability theory.

In *People v. Gonzalez*, 1 N.Y.3d 464 (N.Y. 2004), after a jury found the defendant not guilty of intentional murder but guilty of depraved indifference murder, the New York Court of Appeals determined that a defendant could not be convicted of depraved indifference murder where the defendant first shot the deceased in the chest from a distance of six to seven feet, then shot him in the head as he fell to the floor and shot him eight more times as he lay on the floor. The evidence in that case indicated only an intentional murder. *Id.* at 467-68. *People v. Payne*, 3 N.Y.3d 266 (N.Y. 2004), and *People v. Suarez*, 6 N.Y.3d 202 (N.Y. 2005), followed. In both cases, the jury had acquitted the defendant of intentional murder but convicted him of depraved indifference murder.

This transformation in the case law on depraved indifference murder culminated in *Feingold*, in which the New York Court of Appeals "confirm[ed] what is implicit in the line of cases from *Hafeez* to *Suarez*"–namely, that it "has adopted the view of the Register and Sanchez dissents that 'depraved indifference to human life' is a culpable mental state." *Feingold*, 7 N.Y.3d at 396.

Echevarria-Perez's claim that the homicide was intentional was made for the first time in his C.P.L. § 440.10 motion, in an apparent attempt to take advantage of the shift in New York law leading to the discarding of *Register*'s formulation of "depraved indifference" murder. However, Echevarria-Perez's conviction became final well before the *Feingold* decision in 2006

-24-

which explicitly overruled *Register*.[2]  Thus, the *Register/Sanchez* line of cases applies to the

evaluation of Echevarria-Perez's legal-insufficiency claim.

"[V]iewing the evidence in the light most favorable to the prosecution," *Jackson*, 443

U.S. at 319, at the time of Petitioner's conviction, a reasonable jury applying the law as

explicated by the New York Court of Appeals in *Register* and *Sanchez*, could have found the

evidence presented at Petitioner's trial sufficient to establish guilt beyond a reasonable doubt of

depraved indifference murder. The Appellate Division's summary of the pertinent trial proof in

its discussion of the weight-of-the-evidence claims is helpful:

> During an altercation, the victim punched defendant in the face and broke his car
> window, at which time defendant drove his car around the block. Defendant
> thereafter observed the victim in the street, and it is undisputed that defendant
> struck the victim with the car. Indeed, defendant *admitted in his statement to the
> police that he saw the victim standing in the road and struck him with the car
> because he believed that the victim was going to punch him again.*

*People v. Perez*, 12 A.D.3d at 1029 (emphasis supplied); *see also* T.723-24 (After being punched

by the victim, Petitioner told the police, he "took off," then "turn[ed] around," picked up one of

his cohorts, and ran into Saez because "I thought he was going to hit me again, so I hit him." ).

Echevarria-Perez could argue that because he had a reason for striking the victim–purported self-

defense–he acted with intention which negates a finding that he was guilty of a non-intentional

homicide such as depraved indifference murder. He could argue that his action, taken in alleged

self-defense, showed that he did not have the requisite "depraved indifference" *mens rea* under

*Feingold*, i.e., "a depraved and utterly indifferent actor is someone who does not care if another

---

[2]    The Court notes that the New York Court of Appeals in *Policano*, although not presented with
retroactivity as a certified question from the Second Circuit, went out of its way to hold that *Hafeez, Gonzalez,
Payne, Suarez* and *Feingold,* all of which were issued after defendant Policano's conviction became final, should not
apply retroactively to his case. *Policano,* 7 N.Y.3d at 604; *accord, e.g., People v. Jean–Baptiste*, 11 N.Y.3d 539
(N.Y.2008).

is injured or killed".

Because *Suarez* and *Feingold* were decided after Echevarria-Perez's conviction became final, and in light of the Second Circuit's affirmance in the case of *Guzman v. Greene*, this Court will not go on to consider what effect, if any, *Feingold* would have had on this case had it been decided while Echevarria-Perez's appeal was still pending *Guzman v. Greene*, 337 Fed. Appx. 27, 29 (2d Cir. 2009) ("We note, finally, that *People v. Feingold*, 7 N.Y.3d 288, 819 N.Y.S.2d 691, 852 N.E.2d 1163 (2006), which overruled *People v. Register*, 60 N.Y.2d 270, 469 N.Y.S.2d 599, 457 N.E.2d 704 (1983) and *People v. Sanchez*, 98 N.Y.2d 373, 748 N.Y.S.2d 312, 777 N.E.2d 204 (2002), were decided after Guzman's conviction became final. We therefore need not discuss how, if at all, this case would have been affected if *Feingold* had been decided earlier.") (summary order), *aff'g Guzman v. Greene*, 425 F. Supp.2d 298 (E.D.N.Y. 2006) (denying habeas relief on the basis that sufficient evidence supported defendant's conviction for depraved indifference murder and performing independent retroactivity analysis and finding *Feingold* and *Suarez* should not apply retroactively).

Under the *Register*/*Sanchez* line of cases, the legal-sufficiency analysis entails looking at the objective circumstances surrounding the defendant's actions. As the Fourth Department explained in its discussion of Petitioner's weight-of-the-evidence claim, the "crux of [depraved indifference] murder [under *Register/Sanchez*] [wa]s recklessness exaggerated by indifference to the circumstances objectively demonstrating the enormity of the risk of death from the defendant's conduct"[.]" *People v. Perez*, 12 A.D.3d at 1029 (quoting *People v. Sanchez*, 98 N.Y.2d at 380).  In other words, the question is "[w]hether the act qualifie[d] as depraved indifference [wa]s based not on the subjective intent of the actor but, rather, on an objective

assessment of the degree of risk presented by defendant's reckless conduct." *Id.* (quotations omitted). Said another way, "[e]vidence of the actor's subjective mental state . . . [was] not pertinent to a determination of the additional element required for depraved indifference murder: whether the objective circumstances bearing on the nature of a defendant's reckless conduct are such that the conduct creates a very substantial risk of death[.]" *People v. Roe*, 74 N.Y.2d 20, 24 (N.Y. 1989) (citations omitted).

In *People v. Gomez*, upon which the Fourth Department relied in Echevarria-Perez's case, the charges arose out of an incident in which defendant drove his car several blocks on a busy New York City street and the sidewalks adjacent to it, killing two children and endangering the lives of several pedestrians. 65 N.Y.2d at 10. After being convicted of two counts of depraved indifference murder, Gomez contended on appeal that the evidence was insufficient to support a finding that he recklessly engaged in conduct, under circumstances evincing a depraved indifference to human life,  which created a grave risk of death to another person and thereby caused death. *Id.* The New York Court of Appeals, relying upon *Register*, found that

> [t]he risks posed by defendant's conduct in this case and his callous indifference to them entitled the jury to conclude that his conduct placed the crime on the same level as intentional murder. As to the first murder count, defendant sped out of the gas station and entered traffic on a busy New York street at a speed in excess of 40 miles per hour. After striking two cars, he continued accelerating for nearly a block, partly on a sidewalk, until he struck the first victim. These factors, particularly the excessive speed and the failure to brake, satisfy the depraved indifference element. Turning to the second murder count, similar conduct is present, including excessive speed and failure to brake when requested to do so by an occupant of the car, but there is also the additional evidence of depraved indifference to be found in defendant's comment as he continued down the sidewalk and before the second victim was struck that he could not stop because he had already killed someone.

*Gomez*, 65 N.Y.2d at 11. Addressing the concern that murder prosecutions would thereafter result from fatal accidents involving merely reckless driving, the Court of Appeals noted that "an automobile also may be used, as here, in a wanton and callous manner, thereby posing a grave risk of death and in fact causing death." *Id.* at 12. Because "[t]he focus of the depraved mind murder statute is to allow a trier of fact to discern depravity of mind from the *circumstances* under which an object or instrumentality is used[,]" *id.*, the "depraved conduct cannot be excused by the inherent social utility of the object or instrumentality used to cause death[,]" *id.*

The Fourth Department in Echevarria-Perez's appeal relied upon this statement from *Gomez* to conclude that the "jury had an adequate basis "to discern depravity of mind from the circumstances under which [the car was] used," *Perez*, 12 A.D.3d at 1029-30 (quoting *Gomez*, 65 N.Y.2d at 12), by Petitioner in the act of striking Saez.  As noted above, eyewitness Cunliffe testified that Petitioner reversed direction in the middle of Clinton Avenue, followed Saez around the corner onto Clifford Avenue, "floored it," and accelerated for 25 feet or so before crashing "right into [the victim]." T.527-32, 563-64. The victim's companion, Vega, estimated that Petitioner's car had reached 50 or 60 miles per hour at the point of impact. T.427. After being properly instructed in the law as it existed in the *Register/Sanchez* line of a case, it was not irrational for the jury to conclude that "an objective assessment of the degree of risk presented by defendant's reckless conduct," *Register*, 60 N.Y.2d at 277,  demonstrated that it was so "wanton[ ]" that "the lesser risk sufficient for manslaughter is elevated into the very substantial risk present in murder," *Roe*, 74 N.Y.2d at 24.

**IV.      Conclusion**

Ariel Echevarria-Perez's petition for a writ of habeas corpus pursuant to 28 U.S.C. §
2254 is denied, and the petition is dismissed.  Because Echevarria-Perez has failed to make a
substantial showing of a denial of a constitutional right, I decline to issue a certificate of
appealability. *See* 28 U.S.C. § 2253(c)(2).

**IT IS SO ORDERED.**

/s/  *Victor E. Bianchini*
_____
VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:         April 26, 2011
               Buffalo, New York